# CIRCUIT COURT OF BALTIMORE CITY

Filed March 21, 1893.

ALEXANDER SHAW

VS.

THE WEST VIRGINIA CENTRAL AND PITTSBURG RAILWAY CO.; THE PIEDMONT AND CUMBERLAND RAILWAY CO.; HENRY G. DAVIS; THOMAS B. DAVIS; STEPHEN B. ELKINS.

*Charles Marshall, John L. Thomas* and *W. Irvine Cross* for plaintiff.

*Wm. Pinkney Whyte, Bernard Carter* and *Frank Wood* for defendants.

DENNIS, J.—

1. A Court of Equity will not at the suit of a minority stockholder, interfere with the internal management, or disputes, of a corporation, unless the act complained of, is *ultra vires*, or otherwise illegal, or unless it is fraudulent as against such stockholder.

2. If the act complained of does not come within these exceptions, the wrong, if any, is a wrong against the company, *qua* company; and the company alone has the right to determine whether it is a wrong done to it; and if it determines it is a wrong, whether it is advisable for it to litigate the question; and if it determines it is advisable to do so, the suit must be in its own name and by its authority.

3. Where a contract is proposed to be entered into between two companies, the majority of the stock in each of said companies being held by the same parties, and the said contract is before the stockholders of one company for consideration, the majority stockholders in that company are entitled to vote their stock according to their views of their own interest; and, in the absence of fraud, or illegality in the proposed contract, or proof that it is *ultra vires*, a Court of Equity will not interfere, at the suit of a minority stockholder, to forbid it; all considerations relating to the propriety or advisability of the act being within the sole determination of the majority of the stockholders of the company.

4. While a director of a company occupies towards his company, and towards its stockholders, a *fiduciary* relation, and is therefore bound by the rules which govern such relationship, a *stockholder* occupies, neither as to the company, or the other stockholders, any such relation; and he is free to vote his stock with a sole view to his own interests; provided always, that this right is not exercised in a way to work a fraud upon others, and that the proposed action is not illegal, or *ultra vires;* and the fact that the majority stockholders of a company, which it is proposed shall enter into a business relation with another company, are also the majority stockholders of the latter company, makes no difference in the application of the rule; and even when the directors of the two companies happen to be the owners of the majority of the stock in each the rule is the same; the fact of them being directors not depriving them of their rights as stockholders.

OPINION.

The West Virginia Central and Pittsburgh Railway Company is a corporation chartered by the State of West Virginia, its eastern terminus being Piedmont, and its present western terminus being Elkins, both situated in that State. Under its charter, it has the power to further extend its line so as to connect with the Chesapeake and Ohio Railroad and the Richmond and Alleghany Railroad.

Its chief traffic is coal and it is the owner of extensive coal lands, amounting to some 30,000 acres; the most valuable, in respect to the quality of

the coal, being those in what is known as the Elk Garden basin, although these amount, in the quantity of coal they contain, to considerably less than one-third of what can be mined from the whole of the company's possessions.

Until the completion of the Piedmont and Cumberland Railroad, the West Virginia Central had no means of getting its coal to market, except over the Baltimore and Ohio Railroad, with which it connected at Piedmont. Up to the year 1885, the relations between the Baltimore and Ohio and the West Virginia Central roads had been friendly; but in that year, a break in these relations occurred, and the Baltimore and Ohio Company refused to make any satisfactory arrangements whereby the West Virginia Company could get its coal to market. In the expressive language of one of the witnesses, the Baltimore and Ohio had the West Virginia road "bottled up," and it used the power the situation gave it relentlessly.

Under these circumstances it became absolutely necessary, as is conceded upon all sides, that the West Virginia Central Company should have another outlet for its traffic, for without such an outlet its business was practically dead; and accordingly the defendants, Messrs. Henry G. and Thomas B. Davis and Stephen B. Elkins, who were the largest stockholders in the West Virginia Central Road, and Mr. Henry G. Davis being president of the company, projected the scheme of the Piedmont and Cumberland Railroad, which should run from Piedmont to Cumberland, at which latter place it would connect with the Pennsylvania Railroad, thus securing an outlet to market for its traffic, entirely independent of the Baltimore and Ohio Road. With this view, the Piedmont and Cumberland Railroad Company was incorporated, the Messrs. Davis and Elkins subscribing for a majority of the stock, the Pennsylvania Railroad taking 4,000 shares, and the balance being distributed in small holdings. In order to give value and stability to the bonds, from the proceeds of the sale of which it was designed to raise the bulk of the money for the building of the road, a traffic agreement was entered into between the three roads, by which at least one-half

of all freight coming over the West Virginia Central and the Piedmont and Cumberland roads was to be given to the Pennsylvania road, and the latter road was to set apart five per cent. of all the earnings from the traffic going to or coming from its road to the West Virginia Central as a guarantee for the payment of the interest on these bonds year by year, in the event of the earnings of the Piedmont and Cumberland Road not being sufficient for that purpose. At the time this agreement was made by Henry G. Davis, as president of the West Virginia Central Road in May, 1886, it had not been authorized by the company, but it was subsequently reported to the stockholders in January, 1887, and by them unanimously ratified. With the money thus raised from the sale of these bonds, together with that arising from certain assessments upon the stock, the road was built, and was ready to be operated in August, 1887. During the whole time of the building of this road, up to the meeting of stockholders in January, 1887, the plaintiff was a director in the West Virginia Company, and it is perfectly clear from the evidence that he knew under whose auspices the road was being built, who were the owners of its stock, and that it was contemplated that the two roads should run in connection with each other; for the report of the President and the Board of Directors of the West Virginia Central (he being at the time a member of the board) to the stockholders at the annual meeting in January, 1887, distinctly stated all these facts—and also the further fact that "it may be found to their mutual advantage to have this road (i. e. the West Virginia Central) *operate* the Piedmont and Cumberland."

In accordance with this last suggestion, in February, 1887, several months before the new road was ready to be operated, a resolution was offered in the board of directors of the West Virginia Central (this board consisting of ten members at that time, and a majority of them consisting of persons who had no interest in the Piedmont and Cumberland road) authorizing Henry G. Davis, as president, with the advice and assistance of the counsel of the company (who was the Hon. William Pinkney Whyte—himself a stockholder of the West Virginia Cen-

tral Company, but not of the Piedmont and Cumberland), to enter into such an agreement for the operation of the Piedmont and Cumberland road, "for a period not exceeding two years, as he may think proper and best in the interest of this company; and that he report his action, under the resolution, to the next stockholders' meeting." And in October, 1887, two months after the Piedmont and Cumberland road had begun to be operated, the same board of directors unanimously adopted a resolution appointing the late Hon. Wm. H. Barnum "to act with President Davis for the purpose of arranging with the Piedmont and Cumberland road for its operation or lease, under the resolution adopted February 28th, 1887."

At the next annual meeting of the stockholders, in January, 1888, Mr. Davis, president of the West Virginia Central road, reported that, under the above resolutions of February and October, 1887, appointing Mr. Barnum and himself to make arrangements for the operation or lease of the Piedmont and Cumberland Road, "no permanent arrangement had been made with said company; for the present, the latter road (the Piedmont and Cumberland) was being operated by the West Virginia Central for 60 per cent. of the gross earnings of the road." And in the annual report of the president and directors of the West Virginia Central to the stockholders in January, 1889, the latter are told that the same arrangement for the operation of · the Piedmont and Cumberland Road is still continued.

These several reports by the president and directors of the West Virginia Central road to its stockholders, in 1887, 1888 and 1889, were *unanimously* approved.

The Piedmont and Cumberland Road having thus been operated by the West Virginia Central since its completion in August, 1887, under this temporary arrangement made under the authority of a unanimous vote of the directors of the latter company, which action was unanimously ratified by the stockholders; and the fact that the road continued to be thus operated being announced to the stockholders at each annual meeting, and the said report to that effect by the president and board of directors being each time

unanimously approved by the stockholders; at the next annual meeting of the stockholders of the West Virginia Central Company in January, 1890, Mr. Wm. H. Gorman, who owned 300 shares of stock in the West Virginia Central and only one share in the Piedmont and Cumberland Road, offered a resolution proposing to lease the Piedmont & Cumberland Road for a period of twenty-one years, the West Virginia Central to pay the cost of its operation and to receive 60 per cent. of the gross receipts of its earnings, submitting at the same time a form of lease. Thereupon Mr. Wm. Keyser, a stockholder of the West Virginia Central, but having no interest in the Piedmont and Cumberland Road, offered the following resolution: "Resolved, that the proposed lease of this company of the railroad and property of the Piedmont and Cumberland Railway Company be referred to the board of directors for investigation and ratification, if, in the judgment of the board, the said lease shall be found to protect and promote the interests of the company." For this resolution, Gov. Whyte (the counsel of and a stockholder in the West Virginia Central, but not interested in the Piedmont and Cumberland) offered the following substitute, which was adopted unanimously, so far as the minutes of the meeting show, although the plaintiff was present: "Resolved, that the lease proposed be referred to a committee of three stockholders, to report as to the propriety of its acceptance to an adjourned meeting of the stockholders; and when this meeting adjourns, it shall be adjourned to the 15th day of March, 1890, *when this subject shall be considered.*"

The chairman appointed on this committee Mr. Wm. Keyser, Gov. Whyte and S. B. Elkins, the latter being the only member of the committee having any interest in the Piedmont and Cumberland Railroad.

This committee, having fully considered the matter of the proposed lease, on the 15th day of March, 1892— that being the day upon which they were required to make their report by the resolution under which they were appointed, instead of recommending the acceptance of the lease of the Piedmont and Cumberland Road as prepared by Mr. Gorman, unanimously

recommended another form of lease, under which the West Virginia Central should receive sixty-three per cent. of the gross earnings of the Piedmont and Cumberland Road, instead of sixty per cent. as provided in the lease submitted by Mr. Gorman; and which also contained other amendments relating to charges for future improvements put upon the Piedmont and Cumberland Road—supporting these recommendations by an elaborate report. No action was taken upon this report, for on the 14th of March, 1892, the plaintiff filed the bill in this case and on the next day, the very day fixed for the report of the committee appointed for determining the proper terms of the proposed lease, the writ of injunction was served as the meeting of the stockholders was about to assemble, prohibiting the making by them of any lease whatever of the Piedmont and Cumberland Road until the questions raised by the bill were determined.

The stock of the West Virginia Central and Pittsburgh Railway Company consists of 60,000 shares, of which 5000 has never been issued; the Messrs. Davis and Elkins (with their families) own 30,000 shares, the plaintiff owns 7000, and the remaining 18,000 shares are divided among a considerable number of other holders.

The bill is filed by the plaintiff as a minority stockholder, on behalf of himself and all other stockholders who may make themselves parties to the suit (no one else has made himself a party) ; and the prayer for relief is:

1st. That the Piedmont and Cumberland road may be decreed to account to the West Virginia Central Road for all the money received by it from, or expended upon it, by the West Virginia Central, and that a decree may be entered in favor of the latter company for amount so found to be due; and

2nd. That the officers of the West Virginia Central road may be restrained from executing the proposed lease, or any other lease of the Piedmont and Cumberland Road, until the further order of the Court; and that the Messrs. Davis and Elkins be restrained from voting the stock held by them upon any resolution to adopt a lease of said road, or from voting said stock in any way to secure action

by the stockholders of the West Virginia Central Road in favor of any lease until the further action of the Court.

The numerous allegations of the bill may be divided into two classes, viz: 1st. Those that relate to transactions and dealings between the West Virginia Central Road and the Messrs. Davis and Elkins, as its officers and majority stockholders, but which have nothing to do whatever with the transaction between the West Virginia Central and the Piedmont and Cumberland Roads; and 2nd. Those which relate to the transactions between the two roads, and the conduct of the Messrs. Davis and Elkins as officers or directors of the two companies.

Now, *the prayer for relief* does not relate at all to the first class of these allegations, or to any one of them; it is strictly confined to the second class. And as it is the prayer for relief which determines the issues to be decided, and the scope of the inquiry, it is clear that all the allegations which relate to transactions between the West Virginia Central road and these defendants, with which the Piedmont and Cumberland road had nothing to do, are wholly immaterial for the purpose of determining the propriety of granting the only relief the Court is asked to give.

Omitting consideration, therefore, of all those allegations which relate exclusively to the transactions between the West Virginia Central Road and the Messrs. Davis and Elkins, let us take up the second class upon which alone the two branches of the prayer for relief can rest. And—

I. AS TO THE PRAYER FOR AN ACCOUNT. It is alleged,

1. That the Messrs. Davis and Elkins, being the owners of the majority of the stock of the Piedmont and Cumberland Road, selected a location for the road so low along the line of the Potomac river, along which it ran, that the road was subject to overflows in times of freshets, and that it was so cheaply and poorly constructed as to be ruinously expensive to operate; and they *designedly* so constructed it because they intended to throw the operation of it upon the West Virginia Central by virtue of their control of the stock of the latter company.

2. That before the Piedmont and Cumberland Road' was in a fit condi-

tion to carry on business, the said parties used their power as officers of the West Virginia Central to compel it to complete the Piedmont and Cumberland Road, and to put upon it permanent improvements and betterments which were charged to the West Virginia Central as operating expenses, where they should have been charged to the Piedmont and Cumberland as part of the construction account.

3. That, having thus put the Piedmont and Cumberland Road in an improved condition, although it still could only be operated at an immense expense, the said parties determined to have the West Virginia Central make a permanent lease of the Piedmont and Cumberland Road upon terms most advantageous to the latter, but ruinous to the former road, and that the proposed proportion of gross earnings to be given to the West Virginia Central (viz: 60 per cent.) was less than the usual rate for the operation of even a well constructed road, and grossly inadequate in the case of the Piedmont and Cumberland Road.

4. That, when said lease was offered at the stockholders' meeting in January, 1890, the plaintiff and the other minority stockholders opposed it, and opposed the making of any lease until the accounts of the companies could be adjusted; that the Messrs. Davis and Elkins, although having the power to adopt the lease by virtue of their control of the majority of the stock, consented to adjourn the question of the lease until a stockholders' meeting to be held on March 15, 1890, at which adjourned meeting it is the design of the said parties to use their power as owners of the majority of the stock of the West Virginia Central Company to compel the ratification of the said lease. And it is further alleged that the plaintiff has made every effort to prevent said lease, and to secure an account between the two companies through the company's corporate agencies.

I will consider these allegations in the order above set forth.

#### IMPROPER LOCATION OF THE ROAD.

The testimony shows that Mr. Crawford, who was chosen to locate the Piedmont and Cumberland Road, was an engineer of the Pennsylvania Railroad Company of long experience, and the chief assistant of Mr. Dubarry, who had charge of the entire engineering department of that road. He testifies that he made a careful and thorough examination of the whole subject, in his efforts to get a road built to the best advantage "without regard to cost." The location thus selected by him, was then submitted to Mr. Brown, the chief engineer of the Pennsylvania road, and afterwards to Mr. Roberts, the President of the company, by both of whom it was approved; and the road was constructed after the plans thus adopted. Mr. Crawford testifies that the grades were put as high as they considered necessary to keep above extreme high water, according to the evidence they had at that time; that if it had been located higher up on the hillsides, the operation of it would have been very expensive; and that "taking its location, alignments, grades and the mode in which it was built the road, for *economical operation, is equal* to that of the Baltimore and Ohio Railroad," the two roads running parallel between Piedmont and Cumberland. Mr. Charles H. Latrobe, the well-known engineer of this city, testified that he had gone over and made an examination of its location and construction; he finds no objection to it, from an engineering standpoint; on the contrary he says that as respects the curvatures, it is superior to the West Virginia Central, and that to have built it upon the hillsides would have added materially to its length and cost of construction, and considering that the Baltimore and Ohio had already had the first choice of location, the location of the Piedmont and Cumberland was the best possible under the circumstances. Mr. J. C. Wrenshaw is the only engineer who criticises the location as being too low, and that a better and firmer roadbed could have been had if the road had been built upon the hillsides; but he says nothing about the increased cost of construction and operation that would, according to the testimony of the other witnesses, have been thereby entailed. I have thus recited the testimony on this point at some length, because, while the Court is not required to determine what was in fact the best location for the road, it was proper to be shown that the road was built bona fide, according to the plans and location of engineers as competent as can

be found in the profession; and that the charge that it was designedly built cheaply by the Messrs. Davis and Elkins with the view of having the thereby increased costs of operation borne by the West Virginia Central Road is wholly unsupported by the evidence.

As to the completion of the piedmont and cumberland road and the alleged improper charges to construction account.

The Piedmont and Cumberland road began to be operated by the West Virginia Central under the verbal lease reported to and approved by the stockholders as already recited, on the 1st of August, 1887; and, according to the testimony of Porter, who is the superintendent of construction of the West Virginia Central, has been safely operated ever since—"there never having been a wheel off the track to my knowledge." But the real meaning of this charge in the bill, as shown by the argument, is whether at the time its *operation* by the West Virginia Central began, the Piedmont and Cumberland was in such a condition as to completeness of construction that such expenditures necessary for the proper operation of the road as were *thereafter* put upon it, should be charged to construction account and so be paid for by the Piedmont and Cumberland, or as part of the operating expenses, to be paid for by the West Virginia Central under the terms of the verbal lease. The plaintiff claims that a large proportion of these expenditures were necessary to put the road in the condition it should have been in before it was turned over to the West Virginia Central to operate, and that an account should be taken and the amount of these expenditures decreed to be repaid to the West Virginia Central. The principal items of these expenditures were new sidings, station houses, platforms, ballast and new ties in place of the beech ties wherever the latter were put in the road; these items amounting in the aggregate to $32,248.

Mr. Porter, who laid the track of the Piedmont and Cumberland Road, and is now superintendent of construction of the West Virginia Road, testifies that when the road was turned over to the West Virginia Central, it was in fair condition; that the road was well ballasted with stone, except in a few bottom lands where sand ballast was used, which is a good ballast in such locations; that the road was perfectly safe to operate; that it was superior to the condition of the Parkersburg Branch of the B. & O. when it was turned over to the latter to be operated; and that when the Piedmont and Cumberland was turned over to the West Virginia Central to be operated it had sixteen sidings (the length of the road being about 28 miles). And Mr. William Keyser, a gentleman of great experience in railroad matters (who is also a minority stockholder of the West Virginia Central, with no interest in the Piedmont and Cumberland road) thus speaks of the roads which are built to be operated by other roads, "These roads when they are taken over, as was the case of the Piedmont and Cumberland Road by the West Virginia Central Road. 1 think, as a rule, and my experience has shown it such, are in a crude state of construction, and a good deal of work, such as ballasting, widening out ditches and adding to the facilities of the road, are incident to the operation of the road itself, and come in as part of the road department expenses after the road has been put in operation; and there is a continuous expenditure of money by which the road reaches its standard degree of perfection, but it takes a period of years to do it * * * The business developed indicates the places where switches and passing points are required, and the development of business on the line of the road indicates where additional facilities for business are required, and it takes time to accomplish all this and to show what really is needed." Now, without going into all the items of defects as contended for by the plaintiff, I am of the opinion that, according to the above test, and under the evidence in this case, the Piedmont and Cumberland Road was in a fair condition of completeness to be operated, when it was turned over to the West Virginia Central.

Whether the expenditures which have since been made upon it and charged to operating expenses, should have been charged to construction account to be paid by the Piedmont and Cumberland, I do not think is within the jurisdiction of this Court to determine. For it is clear, not only from the testimony of Keyser and

others, and the practice of other roads, but from the very nature of the case that what shall be charged to construction, and what to operating expense account, is necessarily largely a matter of discretion and judgment, to be exercised (in the absence a special agreement in the lease providing another method of settlement) by the executive officers of the respective companies, fairly and with good faith. It must be determined by some one, and no subordinate would have that full and general knowledge of the situation and the business relations between the two roads, as would enable him to deal with the question satisfactorily. There is certainly no principle of law by which it can be precisely determined what should be charged as construction and what as operating expenses, and so far as I am informed no Court has ever undertaken to lay down any rule upon the subject; it must necessarily be left to the determination of the executive officers of the two roads, acting in good faith and fairness, and such appears to be the uniform practice of other roads where the lease provides no other method for determining the questions.

Undoubtedly, cases may occur in which charges to operating expenses may be so grossly and manifestly improper that a Court of Equity might interfere, in a proper bill, upon the ground that they were evidently and necessarily in fraud of the plaintiff's rights. But none of the items claimed to have been improperly charged to operating expenses in this case are of that character, and there is nothing whatever in the testimony to show that even if any of these expenses were improperly charged against the West Virginia Central, it was through anything else than an error of judgment on the part of Mr. Davis, president as he was of both companies. And there is one fact which seems to me to conclusively set at rest any question about his entire good faith in the matter of the respective charges between these two roads.

The unprecedented flood of 1889 (known as the Johnstown flood) caused very considerable damage to the Piedmont and Cumberland Road, by washing away its tracks, injury to bridges, &c. This occurred two years after that road had begun to be oper-

ated under the verbal lease, which, as we have seen, had been approved by the board of directors and also by the stockholders of the West Virginia Central unanimously. All the cost of repairing these damages and puting the road again in running order, amounting to over $70,000, were, by order of Mr. Davis, charged to the Piedmont and Cumberland Road. Now, it must be conceded that where a road has been leased by another to be operated, and it is damaged by a flood or otherwise, the cost of its restoration to a proper condition to be operated, should be borne by the leasing road as a part of the operating expenses. So that, even if it be true that all the charges claimed by the plaintiff to have been improperly made against the West Virginia Central as part of operating expenses, should have been charged against the Piedmont and Cumberland for construction, yet as these expenditures only amount to $32,000, we find the amount charged to the Piedmont and Cumberland Road for construction which should have been charged to the West Virginia Central for operating expenses, to exceed the amount claimed to be properly chargeable against the Piedmont and Cumberland by about $40,000. Thus it should be clear, that whatever errors were made by Mr. Davis in the distribution of these charges, were errors against the Piedmont and Cumberland, and largely in favor of the West Virginia Central Road; and this fact should completely refute the idea of any fraud upon his part in making the distribution, or that it was done in the interest of the Piedmont and Cumberland at the expense of the West Virginia Central Road.

If these expenditures were not fraudulently made, then I think it is clear, upon well settled principles of law, that the *plaintiff* is not entitled to file a bill to have the charges for these expenditures readjusted, even if it should be determined that all the charges against the West Virginia Central were improperly made, and should have been against the Piedmont and Cumberland Road; the West Virginia Central, as a company, could alone maintain such a bill. For the wrong was done against the company, *qua* company, and unless fraud has been practiced, or the acts complained of

are *ultra vires*, or otherwise illegal, the company alone has the right to determine whether it will complain of the alleged injury and seek redress in the Courts; and no single stockholder, or the minority of stockholders, has the right to maintain a suit for that purpose, either in their own name or in the name of the company, when the majority of stockholders decline to elect to do so. For, unless there is a fraud, or the act complained of is illegal, or *ultra vires*, Courts will not interfere with the internal affairs or management of a corporation, but will leave all such matters to be investigated and determined by the action of the board of directors of the company, or of the stockholders, accordingly, as the one body or the other has the right to deal with them, and the action of the proper body is binding on all.

In McDougal vs. Gardiner, Law Reports, Chan. Div., Vol. 1, on p. 23, James L. J. says: "I think it is of the utmost importance in all these companies that the rule which is well known in this Court \* \* \* should be always adhered to; that is to say, that nothing connected with internal disputes between the shareholders, is to be made the subject of a bill by some one shareholder in behalf of himself and others, unless there be something illegal, oppressive or fraudulent—unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it; but that every litigation must be in the name of the company, if the company really desires it. Because there may be a great many wrongs committed in a company; there may be claims against directors; there may be claims against officers; there may be claims against debtors; there may be a great variety of things which a company may well be entitled to complain of, but which, as a matter of *good sense*, they do not think it right to make the subject of litigation; and it is the company, *as a company*, which will make anything that is wrong to the company the subject of litigation, or determine whether it will take steps to prevent the wrong being done.\* \* \* Everything in this bill, as far as I can see, if it is a wrong, is a wrong to the company. Whether it ought to have been done,

or ought not to have been done, depends on whether it is for the good of the company it should have been done, or for the good of the company that it should not have been done; and putting aside all illegality on the part of the majority, it is for the company to determine whether it is for the good of the company that the thing should be done or left unnoticed." And in the same case, Mellish, L. J. on page 25, after saying that in companies things are very often done which ought not to be done, proceeds as follows: "Now, if that gives a right to every member of the company to file a bill to have the question decided, then, if there happens to be a *cantankerous* member or one member who loves litiga tion, everything of this kind will be litigated; whereas, if the bill must be filed in the name of the *company*, then unless there is a *majority* who really wish for litigation, the litiga tion will not go on."

To the same effect are the cases of Gray vs. Lewis, Law Reports, 8 Chan. App., 1050; Taunton vs. Royal Ins. Co., 2 Heming & Miller 135; Simpton vs. Westminster Palace Co., 8 H. L. Cas. 718. In Taunton vs. Royal Ins. Co., where the company had determined to pay a loss by fire, which loss was not covered by the policy, the Court after determining that the proposed payment was not *ultra vires*, refused to entertain a bill by a minority shareholder asking an injunction to restrain such payments, holding that it was for the majority of the stockholders to determine whether it was best for the interests of the company that the suit should or should not be brought, and that the decision of the majority would be binding on the minority whether they liked it or not.

The Supreme Court of the United States, in the case of Hawes vs. Oakland, 104 U. S. 450, after a review, and approval of the English cases, particularly of McDougal vs. Gardiner, in which it says, the best statement of the rule is given, goes on to say: "In this country, the cases outside the Federal Courts are not numerous, and while they admit the right of a stockholder to sue in cases where the corporation is a proper party to bring the suit, they *limit* this right to cases where the directors are guilty of fraud, or a breach of trust, or are proceeding

*ultra vires"*; and it then proceeds to lay down, in its own language, the same principles substantially as are announced in McDougal vs. Gardiner.

Applying these principles to the case before us, as it is clear that these companies had the legal right to have the business relations with each other out of which these accounts grew, and as there is no evidence that the distribution of these charges between the two roads was fraudulently made, it follows that if any charges were wrongfully made against the West Virginia Central, the wrong was done to the company, and the suit must be in its name; and the majority of the stockholders have the sole right to determine whether the suit shall be brought or not—and this is true, although the same persons may hold a majority of the stock in both companies, as I shall endeavor to show later on.

This conclusion applies not only to the accounts between the two roads relating to the money of the West Virginia Central claimed to have been improperly expended on the Piedmont and Cumberland for betterments and permanent improvements, but also to the claim that there is due the West Virginia Central the difference between the 60 per cent. of the gross earnings under the temporary verbal lease under which the Piedmont and Cumberland was actually operated, and the 63 per cent. under the new lease prepared by the committee of stockholders of which Mr. Keyser was chairman. The contention of the plaintiff is, that the larger proportion of the gross earnings (viz: 63 per cent.) to be allowed to the West Virginia Central under the proposed permanent lease, is a confession that the amount allowed it under the temporary lease (viz: 60 per cent.) was inadequate and improper, and fraudulently allowed by reason of the control by the Messrs. Davis and Elkins of a majority of the stock of the West Virginia Company.

Now, as has already been shown in the earlier part of this opinion, whether Mr. Davis, as president of the road, had the right, in the first instance, to make this temporary arrangement for the operation of the Piedmont and Cumberland by the West Virginia Central Road or not, yet certainly the directors and the stockholders of the West Virginia Central had the right to make it, and if the right to make it—*a fortiori*, the right to confirm and ratify it, if made by the president of their company; and the board of directors, a majority of whom were in no way interested in the Piedmont and Cumberland road, having by *unanimous* vote approved of the arrangement—and this arrangement, or temporary lease, at the rate of 60 per cent., having been reported to the *stockholders* of the West Virginia Central, and having been *by them unanimously approved*—it is hard to see how, in the entire absence of any proof or fraudulent misrepresentations or concealments inducing to the making of the temporary contract, a fraud was worked upon the West Virginia Central Road by the rate of compensation agreed upon.

Many considerations might have furnished the grounds for fixing the rental at different rates under the two leases; such, for instance, as the fact that one was a temporary, and the other a permanent arrangement—the growth of business between the lines—the fact that experience in the actual operation of the road showed the proposed new rate would be a fairer division of the earnings between the companies, and many other matters that it is not necessary to suggest; for, no matter what considerations induced the stockholders to propose the rate in the new lease, or to sanction the rate adopted in the old, a Court of Equity will not at the suit of a single stockholder interfere to take away from the majority of stockholders the right to pass upon the value and importance of the various considerations which had to be weighed in making the leases, but will leave the majority to decide for themselves which it is best for them should be done; and if the majority of the stockholders are satisfied with the present settlement of the past dealings between the companies, in so far as it relates to the rate paid the West Virginia Central under the operating contract, it is just as much beyond the jurisdiction of this Court to disturb that settlement as it is to interfere with any other accounts between the two companies. It is, after all, in both cases, simply a question of indebtedness or not, on the part of one company to the other, which,

whether it exists or not, did not originate in any fraudulent or illegal acts by any one, or acts *ultra vires* on the part of the company; and it is the *company*, therefore, acting ultimately by a majority of its stockholders, that alone has the right to determine if anything is due growing out of these matters by the Piedmont and Cumberland to the West Virginia Central Road, and to decide whether, if there is anything due, a suit shall be brought for its recovery.

II. We come now to the second branch of the prayer for relief, which is for injunction to prevent the making by the West Virginia Central Road of the proposed lease, *or of any lease*, of the Piedmont and Cumberland, until these accounts between the two roads have been investigated, and it is determined how much is due the former company, and until an account can be also had of the cost of the construction of the Piedmont and Cumberland Road; the bill alleging that until these facts are determined, the making of any lease of the Piedmont and Cumberland will be a fraud upon the plaintiff, as a minority stockholder.

Put in other words, the proposition amounts to this: That, although the majority of the stockholders of the West Virginia Central road may have all the information *they* think is necessary to enable them to act understandingly in regard to the proposed lease, and although this majority may determine that it is to the best interest of the road that the said lease should be made, yet one stockholder has a right to enjoin their making the lease until the process of the Court has put him in possession of information which he regards as necessary, although the majority do not, before it can be determined satisfactorily whether the lease is one proper to be made or not. Now, it may be remarked in passing that there never has been any difficulty in the plaintiff obtaining all the information he desires in regard to the accounts between the two companies; the books have been open to him, and instead of obstacles being put in his way, he was given by President Davis special facilities for making an examination; and while it is charged that the books have not been kept in the most approved manner of railroad bookkeeping, yet the testimony of Keyser, Hambleton and Ayers, clearly established that the system is entirely intelligible, and does present a full and accurate account of the dealings between the two companies.

But, suppose this were not so, and suppose the Court should order an account, and thus give the plaintiff the information he desires; what then? If he considers the information such, in his judgment, as not to warrant the making of the lease, can he, a single stockholder, still forbid the making of it, when all the other stockholders having made as full investigation as they desire, deem it to their interest that it should be made? Or is the *court*, looking at the information thus obtained, to determine, instead of the stockholders, whether this particular lease ought to be made, and if not, then what would be a proper lease under the circumstances? For it is perfectly manifest that the information asked for must be for the one or the other of these two purposes; no other use could be made of it; and in the absence of some proof of fraud or illegality in the proposed lease, it is too clear for further argument, that under either branch of the proposition, the inquiry is wholly beyond the jurisdiction of this Court.

Besides, the cost of the past operation of the Piedmont and Cumberland Road, and the costs of its construction, while being information which it is proper enough for the stockholders to have before them, are not the only matters which can or should be taken into consideration by the stockholders in dealing with the question of a lease and of its terms; on the contrary, many other business considerations connected with the relative positions of the two roads, such as the prospect of future earnings, the necessities and advantages to each other, the chance of being able to secure other connections or outlets for traffic, and many others that might be suggested, must all enter into the inquiry; and all these inquiries and considerations belong naturally and properly to the stockholders, as being the owners of the two roads, and they are entitled to investigate these matters in any way they see fit, and determine upon a full view of the whole situation whether the proposed lease, or whatever the proposed transaction may be,

(for it is clear that a lease can be governed by no different principles than apply to any other proposed business transaction) will be for their benefit or not; and no case can be found in which a Court has ever undertaken to interfere with this right of the majority of the stockholders of a corporation.

This conclusion would seem to be too clear for controversy in the case of two corporations having ordinary relations to each other, i. e. where the stockholders in the two roads are not the same parties; does, then, the fact that Messrs. Davis and Elkins own the majority of stock in the two companies defeat the application of the rule, and give the Court jurisdiction, under the other circumstances of this case, to grant the relief prayed for? In other words, where the same parties own the majority of stock in each of two corporations between which some business transaction is deemed by the majority of the stockholders in each of said corporation to be desirable, as being mutually advantageous to the said corporations, can a single stockholder of either corporation, representing a small minority of the stock in his own company, maintain a Bill in Equity against his own company, the other company, and the parties, owning a majority of the stock in the two companies, to prohibit the entering upon the proposed business arrangement between the two companies, until he himself consents, after getting the information the Court is asked to procure for him, to the proposed transaction, or until the Court itself passes upon all the considerations which should properly and ordinarily enter into any inquiry as to the advantages of the proposed transaction, and decides that it is one which will best promote the interest of the company of which this minority stockholder is a member; always assuming that the proposed business arrangement is not *ultra vires, illegal* or *fraudulent.* If such a proposition is sound, it is manifest that no business relations whatever can be entered into between two companies so situated, i. e. when the majority of stock in each company is held by the same parties, without the *unanimous consent of every stockholder in each company,* or without the sanction of a Court of Equity.

Now, in the case before us, it is to be *distinctly noted* that there is no question of the validity of transactions which have been entered into on behalf of a company by the *board of directors* of a company, in which transactions they have a personal interest; nor is there any question of the validity of transactions entered into by the *board of directors* of another company, when the same persons are members of each board, or where the majority of each board consists of the same persons. The sole question here is as to right and power of the *stockholders* of the two companies—the holders of the majority of the stock in the two roads being the same persons—to determine as *stockholders* the propriety of the proposed lease; for, as we have seen, it is not proposed that the lease shall be made under the authority of the directors of the West Virginia Central Road, but the question is directly before the stockholders of that company for their determination of the question.

Now, the powers and duties of *directors* of a corporation, and the powers and rights of its *stockholders* are governed by different rules, and depend upon different principles. And here, with all respect for the learned and able counsel for the plaintiff, I may be permitted to say that, in my judgment, the fundamental vice in their argument upon this branch of the case has been in a confusion of, or a failure to discriminate between, the respective powers and rights of directors and stockholders; and all the authorities quoted by them relate to cases either of transactions between two companies where the same parties are directors of both companies, or where the directors propose to enter into a transaction in which they have a personal interest.

But the difference between the powers of the directors and powers of the stockholders of a company, even in a case where the parties have a personal interest in the subject matter to which a proposed business arrangement relates, are very different; and the difference grows out of the difference in the relations they occupy to their company. A director, while not strictly and technically a trustee for the stockholders (as the title to the property is not vested in him), yet does occupy towards them the position of *quasi*

trustee, and so holds a fiduciary relation, which brings him within the rule which guards dealings and transactions between trustee and *cestui que trust* with so much vigilance.

But it is unnecessary to go into the the question of the general power of directors in either of these classes of cases, or into the question of the power of the *directors* of the West Virginia Central to make the proposed lease in this case; for, the question is as to the right, not of the directors, but of the *stockholders* to make it—the directors, as agents of the company being put aside, and the principals—the stockholders, as sole owners of the property of the company—undertaking to act for themselves. And as to the right of the stockholders to act in the matter, a very different rule prevails; for no matter what may be the inability of directors to bind the company in transactions in which they have a personal interest adverse to that of the company in which they are directors, on such disqualification attaches to the votes of stockholders in stockholder-meetings; and the directors holding stock, have a right, as stockholders, to vote their stock as freely as any other stock can be voted, in their own or any interest they may see fit to vote it in, although such voting may be against the interest of the minority stockholders or even of the company itself, provided always that the object for which such vote is cast is not fraudulent, *ultra vires* or otherwise illegal. And this results from the fact that stockholders occupy no fiduciary relation either to the company of which they are members, or *inter sese;* and they have a right to use their property, i. e., vote their stock, as they have a right to use any other property they own, in any manner they may think best calculated to promote their own interest, provided they use it in a lawful way and without fraudulently interfering with another's rights.

In Pender vs. Lushington. Law Reports, 6 Ch. Div. 70, the principle that the right of a stockholder to vote as he might deem best for his own interest, was a right of property, which he could exercise as he might deem most to his interest, is discussed and fully established. Jessel, M. R., after stating a supposed case, which seemed to him to involve the principle at issue

says: "I cannot deprive him (a stockholder) of his property, though he may not make use of the property in the way I approve. This is really the question, because if these stockholders have a *right* of *property* then I think all the arguments which have been advanced to me as to the *motives* which induced them to exercise it, are entirely beside the question." And after quoting a decision of Lord Justice Mellish, in which that Judge had said in a case before him that "though it be quite true that the majority of the stockholders of a company may *vote as they please*, and for the purpose of their own interests, they cannot sell the property of the company and keep the consideration, the proceeds." In other words he (Mellish, L. J.) admits a man may be actuated in giving his vote as stockholders by interests adverse to the interests of the company as a whole, he may think it was for *his particular interest* that a certain course may be taken, which may be, in the *opinion of others*, adverse to the interests of the company as a whole; but he *cannot be restrained from giving his vote in what way he pleases, because he is influenced by that motive.* * * *

There is, if I may so say, no obligation on a stockholder of a Company to give his vote merely with a view to what other persons may consider the interests of the company at large. He has a right, if he thinks fit, to give his vote from *motives or promptings of what he considers his own individual interests.* This being so, the arguments which have been addressed to me, as to whether or not the votes which were given, would bring about the ruin of the Company, or whether or not the motive was an improper one which influenced these gentlemen to give their votes, or whether or not their conduct shows a want of appreciation of the principles on which the Company was founded, appears to be *wholly immaterial.*"

The principle of this case, thus clearly distinguishing between the rights of directors and stockholders in voting upon questions where their own interests are involved, is fully recognized and supported by numerous decisions of the Courts in this country. In Gillett vs. Brown, 23 Fed. Rep. 625. Brewer, Judge (now of the Supreme Court

of the United States) held, "while the *officers* of a corporation occupy trust relations to it, and in the faithful performance of such trusts they would indirectly subserve the interests of *other* stockholders, trust relations to the corporation do not, as to the *stockholders*, *create trust relations inter sese.*" I refer also to the cases of Bill vs. W. Union Co., 16 Fed. Rep. 15; Wallace vs. L. I. Co., 12 Hun. 464, and Manhattan Elevated Road, 11 Daily (N. Y.) 516; and will conclude this reference to authorities with a brief extract from the opinion of the Court in the last quoted case, which seems to me to state the principle accurately and concisely. After discussing the validity of the acts of two Boards of Directors (composed in part of the same persons), the Court says:

"It is argued that if common directors are disqualified from acting, so are common stockholders incapable to ratify agreements between their companies, and that the holder of one share of stock in each company could prevent any action at a stockholders' meeting relating to the two companies, no matter how advisable that action might appear to the holder of any other share. I do not say that the disqualification extends to a *stockholder*. I see no reason why it should. *The disqualification rests entirely on the fiduciary relation. A stockholder is trustee for nobody;* he has only his own interests to look after as such stockholder; closely connected, undoubtedly, he is in practice with every other shareholder, but he holds no such *fiduciary* relation to the corporation as *stockholder* as he holds as director."

These authorities, in my opinion, fully establish the proposition that the Messrs. Davis and Elkins, although holding a majority of the stock in both the West Virginia Central and Piedmont and Cumberland Railroad Companies, have a perfect right to vote that stock as they think best promotes their own interest, in reference to any other business proposed to be transacted between the two companies, in the absence of fraud in the contemplated arrangement, and provided that it is not *ultra vires*, or otherwise illegal.

It is, of course, beyond question that the lease proposed to be made in this case by the West Virginia Central or the Piedmont and Cumberland Road is neither *ultra vires* nor illegal, and, in my judgment, the testimony wholly fails to show that the proposed lease, if it should be adopted by the stockholders of the West Virginia Central Company, would in any way fraudulently affect the rights of the plaintiff as a stockholder in that company; and, therefore, for the reasons given, and under the authorities quoted I am of the opinion that plaintiff is not entitled to the relief he asks.

In the concluding argument of the counsel for the plaintiff it was greatly insisted that, under the circumstances under which the Piedmont and Cumberland Road was built, all the interest held therein by the Messrs. Davis and Elkins, and also all the interest held by the other stockholders (including the 4000 shares held by the Pennsylvania Road) who knew the circumstances under which the road was built, really belonged to the West Virginia Central Company, the said stockholders holding it in trust for that company; and this argument was based upon the theory that the sole value of the bonds of the Piedmont and Cumberland Road rested upon this traffic agreement with the West Virginia Central Road; and this being the state of the case, the Messrs. Davis and Elkins, as stockholders of the West Virginia Central, had no right to run the road for themselves; and the Court was asked, in argument, to decree that all of the said stock so held by the Messrs. Davis and Elkins, or other stockholders, should belong to the West Virginia Central Road.

It is useless to discuss the question thus raised. It is enough to say that the above proposition is not the theory upon which the bill proceeds, nor are there any allegations in the bill, or any phase of the prayer for relief, under which this question can be considered.

After a full review of the whole case, I am of opinion that the plaintiff has made out no case upon any of the grounds for which he asks relief, and I will sign a decree dissolving the preliminary injunction and dismissing the bill.